## ABUSE OF CORPORATE POWER AS TO OCCUPATION OF STREETS.

[Superior Court of Cincinnati, General Term.]

LOUISVILLE & NASHVILLE RAILROAD ET AL V. THE CITY OF CINCINNATI. *

Decided, October 20, 1906.

*Municipal Corporations—Overhead Railway Structure in Streets and Across a Public Landing—Council without Power to Authorize such Occupation, When—Irreparable Injury to the Public—Section 3337-1 Inapplicable.*

1. A municipal council is without power, under existing laws, to authorize a railroad company to occupy a street or public landing with an overhead structure, resting upon fixed permanent supports of the character shown in this case and necessarily involving the exclusive use of the grounds so occupied, and an ordinance granting the right to erect such a structure is void.

2. While from the purposes of its creation and dedication, a public landing includes the free and unobstructed passage of travelers and vehicles, its function is much broader and more important than that of a mere street, and considerations which would forbid the occupation of a street by a railway structure are of commanding application in the case of such a landing.

HOSEA, J.; FERRIS, J., concurs; MURPHY, J., concurs in the judgment.

This proceeding is brought to review and reverse the judgment and order of the trial court at special term, denying a motion to dissolve a temporary restraining order theretofore granted, to prevent the Louisville & Nashville Railroad Company and the American Bridge Company from constructing a railway viaduct across the grounds known as the "public landing" in the city of Cincinnati. All the questions presented in argument upon the hearing in this court, were presented to the consideration of the court below, and are fully discussed upon the authorities in the opinion delivered by that court and reported in *Ohio Law Reporter*, Volume 4, No. 15; N. P.—N. S., 217.

---

*Affirming *Cincinnati* v. *L. & N. R. R. Co.*, 4 N. P.—N. S., 217.

We have given all these questions and the arguments of counsel in relation to the same our careful consideration, and the conclusions reached by us are in accord with the views and findings of the court below. We think that the city council was without power, under existing laws, to authorize a railroad company to occupy the public landing with a structure of the character shown in this case, resting upon fixed permanent supports, which necessarily involves an exclusive use of the grounds so occupied, and that consequently the ordinance is void.

While the reasons and citations of authority given by the court below in its published opinion are so full and satisfactory, as to render a further statement of them unnecessary here, there are additional reasons for the finding that may with propriety be mentioned, based upon facts of which judicial notice may be taken, in so far as they are not specifically included in the record.

The "public landing" is a portion of the river bank, graded to a substantially uniform slope from the first "bench" down to low water line of the Ohio river. This tract extends from east to west along the river, approximately one thousand fe et, east to west along the river, approximately one thousand feet, of Front street, distances varying according to the stages of water in the river, being considerably greater at the west side at the projected line of Main street than at the east side at the projected line of Broadway, but an average at extreme low water of, say, seven hundred and fifty feet. This tract was set apart and dedicated by the founders of Cincinnati as a "public landing," and is the sole public wharf or landing-place of this character possessed by or available to the city, and has been in public use for this purpose from a period beyond the memory of those now living.

The special purpose of its dedication was and is, to afford, by means of its long slope, a safe and convenient landing place for freight and passenger boats at all stages of the river, from extreme low to extreme high water, where at all times (excepting during unusual floods completely submerging it) boats

may land and receive and discharge their cargoes with convenience and safety. An important part of its general function also, is to afford opportunity for wagons to approach the water's edge from the business portions of the city, bringing goods to the boats for shipment and hauling away the discharged cargoes—the slope affording an opportunity for teams to attain easy grades for heavy loads by selecting at will, paths of travel to and fro, at any desired angle to the line of the slope. It is, therefore, properly speaking, not a ''street.'' While the purposes of its creation and dedication include the free and unobstructed passage of travelers and vehicles, its function in this respect is much broader and more important than that of a mere street, by reason of its connection with the landing of boats, the handling of cargoes, and the consequent necessity of entire freedom in selecting paths of travel for haulage at any angle with the slope. In a general sense, the function of the public landing as a place for unloading cargoes is analogous to that of automatic landing-stages which rise and fall with the tide. The Ohio river is subject to frequent changes of elevation, which recur with more or less regularity within wide limits, and for which the slope of the landing affords ample provision. As the river rises, the boats land nearer the upper limit of the slope, but that portion which remains above water still retains *pro tanto* all the functions of the whole.

It is apparent that a fixed structure such as a railway viaduct resting upon a line of piers or abutments extending from east to west upon the slope of the public landing, parallel with the river, while at low stages of the water it might be simply an inconvenience to the public use of the landing, would be absolutely prohibitive of such use whenever the water reached the vicinity of the line of abutments, and at all stages beyond. If teams were compelled to pass between piers or under archways to reach boats, there must be room enough below to turn and get into position to load and ascend the slope again, and this could not be done when the water approached near to the line of the viaduct; and, certainly, interchange of freight between wagons and boats would not be possible at all at higher stages of the water. At

500    SUPERIOR COURT OF CINCINNATI.

L. & N. R. R. Co. et al v. City of Cincinnati. [Vol. IV, N. S.

such times the entire upper part of the slope would be entirely cut off by such a structure as that in question, from its intended use. It is thus clearly apparent that the extent of the destruction of public rights in the premises is not to be measured by the mere spaces occupied by piers, but is co-extensive with the existence of the proposed structure as a whole, which under frequently recurring conditions would effectually destroy the entire use of the public landing as such.

These facts and the great detriment to the public interest that would inevitably ensue from the proposed construction of the railway viaduct, and especially in view of the improvements in the navigation of the Ohio river now under way and the stimulus to the shipping interests of Cincinnati so generally expected to arise therefrom, may well be set off against the argument so strenuously urged in this court based upon the large expenditure made and to be made by the railroad company in the construction of the viaduct, and the loss to ensue to them in case of its completion be not permitted. The exclusive occupancy of a street in a city is usually at most an inconvenience merely, because other streets supply the means of travel between the same points. In this case, however, the destruction of the public landing for its intended use would inflict a loss upon the city that would be very great and would also be irreparable, for there is no available substitute.

These facts and considerations also suggest the entire inapplicability of Section 3337-1, Revised Statutes, as amended April 21, 1904, to the case in hand, as vesting in the city council authority to pass the ordinance in question. That section has exclusive reference, in terms, to the crossing of streets, and it is clearly apparent from its reading that the law-makers had in view a bridge crossing ordinary streets from side to side, and that only. By no reasonable or possible construction can it be held to intend or include a public landing of this character which obviously is not a street in any such sense as contemplated by the statute in question. But even if this were not so and a power exists by virtue of the statute authorizing councils to agree with railroad companies as to the manner of occu-

pation of streets, still, such power must be taken with the limitation existing in the fundamental law originating in the purposes of the dedication to public uses and formulated in the code provision requiring councils to keep such property free from nuisance. To hold otherwise would give to the statute from which the power is claimed to arise in this case by implication, the effect of repealing, by the same implication, the prior and explicit statute declaring the fundamental law. This we can not do. Even if it could be done, we would be relegated at last to the question of abuse of the discretionary power thus vested, and we would still be compelled, upon the facts of this case, to hold the grant void as a palpable abuse of discretion. The question whether or not a structure in public streets is or is not a nuisance, is, and must always be, a judicial question, and no action of the Legislature can oust the courts of their power of determination in this regard, by giving authority to council. We are, therefore, of opinion that, for the reasons here stated, in addition to those pointed out in the opinion of the court below, the judgment denying the motion to dissolve the injunction was correct and should be affirmed, and it is so ordered.

Judgment affirmed.


MURPHY, J.

I concur in the judgment of affirmance of the judgment of the court below. The reason assigned in the above opinion, beginning at the last paragraph on page 2 [of the written opinion] was not before the court and therefore I pass no opinion thereon.

*Kinkead, Rogers & Ellis,* for plaintiffs in error.

*Jesse Lowman,* City Solicitor, and *Walter A. DeCamp,* Assistant City Solicitor, for defendant in error.